[Cite as *Integrated Vascular Servs., L.L.C. v. Kuhel*, 2014-Ohio-5716.]

STATE OF OHIO, COLUMBIANA COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| INTEGRATED VASCULAR SERVICES, LLC., | ) ) ) | |
| PLAINTIFF-APPELLANT/ CROSS-APPELLEE, | ) ) ) | CASE NO. 13 CO 43 |
| V. | ) ) ) | OPINION |
| JAMES JOSEPH KUHEL, | ) ) ) | |
| DEFENDANT-APPELLEE/ CROSS-APPELLANT. | ) ) ) | |

CHARACTER OF PROCEEDINGS:         Civil Appeal from Court of Common
Pleas of Columbiana County, Ohio
Case No. 2011CV691

JUDGMENT:         Affirmed

APPEARANCES:
For Plaintiff-Appellant         Attorney Adam Van Ho
137 South Main Street
Suite 201
Akron, Ohio 44308

For Defendant-Appellee         Attorney Joseph J. Triscaro
30505 Bainbridge Road, Suite 110
Solon, Ohio 44139

JUDGES:

Hon. Gene Donofrio
Hon. Joseph J. Vukovich
Hon. Cheryl L. Waite

Dated: December 19, 2014

DONOFRIO, J.

{¶1} Plaintiff-appellant/cross-appellee, Integrated Vascular Services LLC (IVS), appeals from a Columbiana County Common Pleas Court judgment awarding it $75 on its conversion claim against defendant-appellee/cross-appellant, James Kuhel. Kuhel cross-appeals from the same judgment which also overruled his claim against IVS for frivolous conduct.

{¶2} IVS is owned and operated by husband and wife, Daniel and Michelle Clark. IVS is in the business of providing licensed intravenous (IV) specialists who are dispatched in response to calls for placing IV lines. IVS's office is located in Salem, Ohio. Yet its service area includes much of Ohio as well as portions of Pennsylvania and Kentucky.

{¶3} In 2008, IVS had two full time employees, Mr. and Mrs. Clark. Mrs. Clark is a registered nurse and the nursing director of IVS. Mr. Clark also is a nurse for IVS. IVS also employed per diem nurses to provide IV services. Kuhel was a per diem nurse for IVS in 2008. Kuhel is a registered nurse in the state of Ohio and an IV specialist.

{¶4} In 2009, IVS hired Kuhel as a full-time IV nurse specialist. As part of his employment, IVS provided Kuhel with a car allowance and the use of an American Express credit card due to the amount of business-related driving. According to Mr. Clark, an IV specialist can drive between 250 and 300 miles a day responding to service calls. The credit card could be used for gasoline and other travel-related expenses, such as lodging in bad weather.

{¶5} Kuhel resigned his employment with IVS effective January 6, 2010. Kuhel tendered his resignation letter and returned IVS's supplies on January 5, 2010.

{¶6} According to the Clarks, after Kuhel resigned they discovered credit card purchases they believed to be unauthorized involving the over purchasing of gasoline. The Clarks alleged Kuhel owed IVS $4,789 for unauthorized purchases. Additionally, according to the Clarks, Kuhel promised and failed to obtain his Pennsylvania nursing license. The Clarks assert this resulted in lost profits for IVS.

{¶7} IVS filed a complaint against Kuhel raising two counts of fraud, one

count of conversion, and two counts of breach of contract. Kuhel filed a counterclaim asserting IVS's lawsuit constituted frivolous conduct. Both parties sought compensatory and punitive damages and attorney fees.

**{¶8}** IVS requested a jury trial. But the trial court struck its jury demand when IVS failed to timely pay the jury deposit.

**{¶9}** Consequently, the matter proceeded to a bench trial. The only claim the trial court found to have merit was IVS's claim for conversion. And as to that claim, the court found there was insufficient evidence that Kuhel converted fuel to his own use on any other date except January 4, 2010, when he purchased 27.789 gallons of gasoline at a cost of $75. Since the actual return of fuel was not possible, IVS demanded reimbursement. But there was no evidence that Kuhel reimbursed IVS. Therefore, the trial court entered a judgment in favor of IVS for $75. The court found the parties had not proven the claims for fraud, breach of contract, or frivolous conduct.

**{¶10}** IVS filed a timely notice of appeal on October 31, 2013. Kuhel filed a timely notice of cross-appeal on November 6, 2013.

**{¶11}** IVS raises two assignments of error, the first of which states:

THE DECISION OF THE TRIAL COURT IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

**{¶12}** IVS argues the trial court's judgment was against the manifest weight of the evidence. It notes that at trial Kuhel presented evidence that he fueled up both of his vehicles at the same time on multiple occasions because he wanted to always have a car ready with gas for work. And it notes Kuhel testified that he and his wife only owned two cars and she also needed to drive to work. Additionally, IVS asserts that Kuhel never mentioned using two cars for work to IVS, the Salem Police Department, the municipal prosecutors, or the Ohio State Nursing Board, all of whom investigated this case. IVS claims the trial of this matter was the first time Kuhel stated that he was using two cars for work. And IVS points us to evidence that Kuhel

fueled up his vehicle on April 14, 2009, and was not scheduled to work April 12 through April 15. Yet he fueled up again on April 15. Additionally, it notes Kuhel purchased 27.789 gallons of gas the day before he quit. IVS goes on to offer computations of how many highway and city miles Kuhel should have driven and how much gas he should have purchased in an effort to show that Kuhel over-purchased fuel. IVS contends the evidence demonstrated that Kuhel commingled legitimate fuel purchased with fraudulent fuel purchases.

**{¶13}** Moreover, IVS asserts the evidence demonstrated Kuhel made material misrepresentations about obtaining his Pennsylvania nursing license. It claims Kuhel promised to obtain his Pennsylvania nursing license and failed to do so, which resulted in IVS losing at least three to five jobs, and as many as ten jobs, in Pennsylvania.

**{¶14}** When reviewing civil appeals from bench trials, an appellate court applies a manifest-weight standard of review. *Revilo Tyluka, L.L.C. v. Simon Roofing & Sheet Metal Corp.*, 193 Ohio App.3d 535, 2011-Ohio-1922, 952 N.E.2d 1181, ¶5 (8 Dist.), citing App.R. 12(C), *Seasons Coal v. Cleveland*, 10 Ohio St.3d 77, 461 N.E.2d 1273 (1984). Judgments supported by some competent, credible evidence going to all the material elements of the case must not be reversed, as being against the manifest weight of the evidence. *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279, 376 N.E.2d 578, syllabus (1978). See, also, *Gerijo, Inc. v. Fairfield*, 70 Ohio St.3d 223, 226, 638 N.E.2d 533 (1994). Reviewing courts must oblige every reasonable presumption in favor of the lower court's judgment and finding of facts. *Gerijo*, 70 Ohio St.3d at 226 (citing *Seasons Coal Co.*, supra). In the event the evidence is susceptible to more than one interpretation, we must construe it consistently with the lower court's judgment. *Id.* In addition, the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts. *Kalain v. Smith*, 25 Ohio St.3d 157, 162, 495 N.E.2d 572 (1986). "A finding of an error of law is a legitimate ground for reversal, but a difference of opinion on credibility of witnesses and evidence is not." *Seasons Coal*, 10 Ohio St.3d at 81.

**{¶15}** On a conversion claim, the property owner must demonstrate that (1) he or she demanded the return of the property from the possessor after the possessor exerted dominion or control over the property, and (2) that the possessor refused to return the property. *Tabar v. Charlie's Towing Serv., Inc.*, 97 Ohio App.3d 423, 427-28, 646 N.E.2d 1132 (8th Dist.1994).

**{¶16}** On a fraud claim, the plaintiff must show that the defendant falsely made a material representation or, where there is a duty to disclose, concealment of a fact, with the intent of misleading another into relying upon it, along with justifiable reliance and resulting injury. *Groob v. KeyBank*, 108 Ohio St.3d 348, 2006-Ohio-1189, 843 N.E.2d 1170, ¶47.

**{¶17}** And on a breach of contract claim, the plaintiff must prove the existence of a contract, the plaintiff's performance under the contract, the defendant's breach, and damages. *Doner v. Snapp*, 98 Ohio App.3d 597, 600, 649 N.E.2d 42 (2d Dist.1994).

**{¶18}** We must examine the evidence at trial in order to determine whether the trial court's judgment was against the manifest weight of the evidence.

**{¶19}** As to the claims related to the alleged over-purchasing of gasoline, the evidence was as follows.

**{¶20}** Clark testified that IVS gave its employees a credit card to pay for gas and to occasionally use for a hotel if inclement weather made it too difficult for the employee to travel home from a job. (Tr. 48-49). The credit card was for work-related purchases only. (Tr. 49). Clark explained the terms of the credit card to Kuhel when it was issued to him. (Tr. 49-50).

**{¶21}** Kuhel testified that Clark simply told him he would get a gas card and that they did not have any discussions about the card's terms. (Tr. 403). He only stated that Clark told him he had to turn in receipts for his purchases every two weeks. (Tr. 410-411). Kuhel stated that he was diligent in turning in his receipts, either in person or by mail. (Tr. 411-412).

**{¶22}** Clark also testified that there was no written employment contract

between IVS and Kuhel. (Tr. 126).

{¶23} Clark stated that during Kuhel's employment, there were never any concerns about Kuhel's use of the credit card. (Tr. 59). Kuhel's receipts were always neatly organized and returned to IVS. (Tr. 59).

{¶24} Mrs. Clark testified that Kuhel told her he was going to purchase a new vehicle to use for his employment with IVS. (Tr. 177). He purchased a 2009 Ford Edge. (Tr. 177).

{¶25} Kuhel testified that he drove the Ford Edge for work and also sometimes drove his 2008 Ford Fusion. (Tr. 421). The gas tank size on the Ford Edge was 20 gallons and the tank size on the Ford Fusion was 17.5 gallons. (Tr. 427). He stated that his wife primarily used the Ford Fusion, but she rarely drove anywhere other than to their daughter's house or the grocery store, which were within a mile of their house. (Tr. 422-423). He further stated Mrs. Kuhel was unemployed until August 2009, when she got a job at a nursing home about a mile from their house. (Tr. 423). Kuhel testified that when Mrs. Kuhel drove one of their cars, she would use her own money to fill up the gas tank so that it would be full for him. (Tr. 535-536).

{¶26} After Kuhel resigned, Mrs. Clark compiled a "mileage audit." (Ex. 5). According to Mrs. Clark, the audit shows the dates Kuhel worked, the locations of his jobs, the average mileage to get to those jobs, and the gas that he purchased. (Tr. 183). Mrs. Clark testified she compiled the audit after noticing that Kuhel purchased $75 worth of gas on January 4, 2010, but the last day that he worked for IVS was December 31, 2000, and he turned in his resignation letter on January 5, 2010. (Tr. 190-191). Additionally, she noticed that on January 4, the gas purchase was for 27.789 gallons of gas, but Kuhel's Ford Edge only had a 20-gallon fuel tank. (Tr. 191-193). This aroused her suspicions. (Tr. 195). Mrs. Clark then used Yahoo Maps to calculate the miles Kuhel would have driven and she used the credit card receipts to determine when Kuhel fueled up and how much gas he purchased. (Tr. 195-200). Mrs. Clark found numerous instances of Kuhel purchasing more than 20

gallons of gas at a time. (Tr. 202). She also found numerous instances of "unrealistic" refuels, where Kuhel should not have needed to refuel because he did not drive many miles the previous day. (Tr. 202). According to her calculations, Kuhel over-purchased $4,789 in gas during his employment. (Tr. 222).

**{¶27}** On cross-examination, Mrs. Clark acknowledged that she did not know the routes Kuhel took for his jobs. (Tr. 248). She also stated that IVS did not require Kuhel to keep a mileage log. (Tr. 248-249). Mrs. Clark also admitted that she omitted 85 jobs that Kuhel travelled to from her audit. (Tr. 252-273, 276). She claimed she did not have the nursing notes from those jobs and therefore, did not include them in her audit. (Tr. 252-276). Much later in her testimony, however, she stated she did not include the 85 jobs because she did not dispute them. (Tr. 548).

**{¶28}** Kuhel testified that he used his nursing notes to determine all of the jobs he went on while working for IVS. (Tr. 461; Ex. L). He found that IVS's gas audit failed to account for 85 jobs. (Tr. 461).

**{¶29}** Kuhel testified that during his tenure at IVS he was never reprimanded and his gas purchases were never questioned. (Tr. 440). He also stated that he knew the gas card was only to be used for work purposes. (Tr. 484).

**{¶30}** Mrs. Kuhel testified that she and Kuhel reviewed IVS's audit. (Tr. 351). They then went through the nursing visits that were not included, along with trips Kuhel took to get supplies and to train another employee, and determined there were approximately 6,000 miles missing from the audit. (Tr. 352-353).

**{¶31}** Mrs. Kuhel also testified she would drive one of their vehicles to the gas station while Kuhel drove the other and they would fill up both vehicles on one receipt. (Tr. 370). Mrs. Kuhel stated that she works at a nursing home located one mile from their house. (Tr. 371).

**{¶32}** Kuhel testified that on January 4, 2010, he filled up the tanks in both of his cars for a total of 27 gallons of gas. (Tr. 488). The next day, he decided to quit his employment with IVS. (Tr. 488). He drove from his home in Parma to IVS in Salem, approximately 150 miles round-trip, to turn in his supplies and tender his

resignation, which would have used approximately nine gallons of gas. (Tr. 488-489).

**{¶33}** Kuhel tendered his resignation on January 5, effective January 6, 2010. (Ex. 11).

**{¶34}** Given this evidence, we cannot conclude that the trial court's judgment was against the weight of the evidence.

**{¶35}** As to the breach of contract claim for the gas purchases, the trial court found that, at best, the evidence was evenly balanced. Therefore, it concluded that IVS did not meet its burden of proof.

**{¶36}** The evidence on this claim revealed the following. The parties admitted there was no written contract. Both parties agreed that the credit card was for work-related purchases only. The only conflict in the evidence on this claim was whether Kuhel used all of the gas he purchased for work and not for his personal use. IVS presented evidence, by way of its gas audit, that Kuhel purchased more gas than was needed for his work-related travels and that he sometimes purchased more than his 20-gallon Ford Edge gas tank could hold. But Kuhel presented evidence that the gas audit failed to include 85 jobs he travelled to and that while he sometimes fueled up both of his vehicles, if his wife drove one of them she always refueled using her own money.

**{¶37}** As the trial court found, the evidence was evenly balanced. The burden of proof was on IVS. Because the evidence weighed evenly on both sides, IVS did not meet its burden of proof.

**{¶38}** As to the fraud claim for the gasoline purchases, the trial court found there was no evidence that Kuhel submitted false or altered receipts, no evidence that the receipts were inaccurate, and no evidence that Kuhel lied about the receipts or misrepresented what they purported to be. Therefore, the trial court concluded the fraud claim failed.

**{¶39}** The trial court's findings are all supported by the evidence. IVS failed to present any evidence that Kuhel falsely made a material representation with the

intent of misleading IVS. Kuhel regularly submitted his gas receipts, even those for purchases exceeding 20 gallons. IVS never questioned him regarding his gas purchases during his employment. There was no evidence whatsoever that Kuhel lied to IVS or concealed anything from his employer regarding his gas purchases.

**{¶40}** As to the claims related to Kuhel's failure to obtain his Pennsylvania nursing license, the evidence was as follows.

**{¶41}** Clark testified that at the beginning of Kuhel's employment with IVS, they had discussions about the need for Kuhel to obtain his Pennsylvania nursing license. (Tr. 46). Clark stated that IVS services a section of western Pennsylvania and needed nurses to be licensed in that state. (Tr. 46-47). He testified that during the course of Kuhel's employment, he repeatedly instructed Kuhel to obtain his Pennsylvania license. (Tr. 65-66). Finally, in December 2009, Clark sent Kuhel an email telling him that if he did not take steps to get his Pennsylvania license by January 2, 2010, IVS would have to discipline him by taking him off the schedule. (Tr. 67; Ex. 9B).

**{¶42}** Kuhel agreed that he and Clark discussed the need for him to obtain a Pennsylvania license. (Tr. 403-404). Kuhel testified that initially Clark did not put a time frame on when he needed to obtain the license. (Tr. 404). But on December 8, 2009, Clark sent him an email stating that he needed to "take care of" his Pennsylvania license by January 2, 2010. (Tr. 449-450; Ex. C). Consequently, Kuhel filled out an application for his Pennsylvania license and left it for Mrs. Kuhel to mail. (Tr. 451). Mrs. Kuhel testified that she mailed Kuhel's application for a Pennsylvania license. (Tr. 340).

**{¶43}** Clark acknowledged a copy of an application for a Pennsylvania license filled out by Kuhel and dated December 29, 2009. (Tr. 70-71; Ex. 10). However, he testified that at the time Kuhel resigned from IVS, he had not obtained his Pennsylvania license. (Tr. 71-72).

**{¶44}** Clark testified that there were "between three and five, maybe as many as ten" jobs IVS lost because Kuhel did not have a Pennsylvania license. (Tr. 67).

He later testified it was potentially as many as three to five per week. (Tr. 68). Clark stated that IVS's profit margin on these jobs was about $25. (Tr. 69). Therefore, he estimated IVS lost $75 to $125 per week during Kuhel's employment. (Tr. 69).

**{¶45}** As to the breach of contract claim for failing to obtain a Pennsylvania license, the trial court found there was no written contract between IVS and Kuhel requiring Kuhel to obtain his Pennsylvania license as a condition of his employment. The court noted that the parties seemed to agree that obtaining a Pennsylvania license was something Kuhel would need to do in the future. And the court pointed out that Kuhel did apply for his Pennsylvania license based on Clark's December 8, 2009 email issuing an ultimatum.

**{¶46}** The evidence supports the trial court's findings. There was no written contract between the parties speaking to the need for Kuhel to obtain his Pennsylvania license. And both Kuhel's and Clark's testimony indicate that obtaining a Pennsylvania license was something Kuhel would do at some time during his employment with IVS. Moreover, after Clark emailed Kuhel about the need for him to take the steps to obtain his license by January 2, 2010, Kuhel completed the application and his wife mailed it for him. Thus, the weight of the evidence supports the trial court's conclusion that there was no breach of contract.

**{¶47}** As to the fraud claim for failing to obtain a Pennsylvania license, the trial court found that, at best, obtaining a Pennsylvania license was an anticipated future act. It noted that the only specific date ever mentioned by IVS was January 2, 2010, and that came in a December 8, 2009 email. The court found that fraud could not be predicated on a future event. It noted there was no evidence that Kuhel made a promise that he did not intend to keep when he made it.

**{¶48}** IVS did not present any evidence that Kuhel falsely represented that he would obtain his Pennsylvania license with the intent of misleading IVS into relying upon it with justifiable reliance and resulting injury. Up until the December 8 email, IVS had not put any deadline on Kuhel to obtain his Pennsylvania license. And when IVS did impose this deadline, Kuhel testified that he completed the application and

his wife mailed it in.  Thus, there is no evidence of fraud.

**{¶49}** In sum, the trial court's judgment dismissing IVS's claims for breach of contract and fraud is supported by clear and convincing evidence.  Accordingly, IVS's first assignment of error is without merit.

**{¶50}** IVS's second assignment of error states:

> THE TRIAL COURT VIOLATED APPELLANT'S RIGHTS UNDER ARTICLE ONE, SECTIONS FIVE AND SIXTEEN OF THE OHIO CONSTITUTION AND THE FIFTH, SEVENTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION WHEN IT STRUCK APPELLANT'S JURY DEMAND.

**{¶51}** Here IVS argues the trial court violated its right to due process when the court struck its jury demand on the same day it paid its jury costs.  IVS contends that per the trial court's docket, the court's entry striking its jury demand came later the same day that it paid the jury costs.

**{¶52}** An appellate court reviews a trial court's denial of a jury trial based on the litigant's failure to pay the jury deposit for an abuse of discretion.  *Runge v. Brown*, 6th Dist. No. OT-12-033, 2013-Ohio-3064, ¶12.  An abuse of discretion connotes more than an error of law; it implies that the trial court's attitude was unreasonable, arbitrary, or unconscionable.  *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

**{¶53}** IVS included a jury demand in its September 29, 2011 complaint.  Kuhel did not request a jury trial.  On September 28, 2012, the trial court held a telephone conference with the parties and entered a judgment entry and scheduling order.  In its judgment entry the court ordered:

> Any party demanding a jury trial shall pay a deposit to the Clerk of Courts in the amount of Five Hundred ($500.00) Dollars not later than the date of the final pretrial.  If not paid, that party's jury demand will be

stricken and the case will proceed as a bench trial on the day scheduled.

The court also ordered the parties to file their proposed jury instructions, proposed jury interrogatories, and verdict forms not later than three days before the final pretrial. The court set the final pretrial for January 11, 2013.

**{¶54}** On January 11, 2013, the trial court held a final pretrial. At this time, IVS had not filed proposed jury instructions, proposed interrogatories, or verdict forms. Additionally, it had not paid the $500 deposit to the clerk of courts for the jury trial. By joint request of the parties, the court continued the trial date to April 29, 2013, and set another final pretrial for April 11, 2013. The court stated that all of its previous orders remained in effect.

**{¶55}** On April 11, the court held the final pretrial. It noted that all previous orders were still in effect and that the trial would begin on April 29, 2013.

**{¶56}** On April 26, the court and parties had a telephone conference to discuss the upcoming trial. Following the conference, the court put on a judgment entry stating that as of the time of the conference, IVS had not abided by the terms of its scheduling order. It noted that it had ordered a jury deposit to be paid and proposed jury instructions, proposed interrogatories, and verdict forms to be filed. Therefore, the court ordered IVS's jury demand stricken and stated that the matter would proceed as a bench trial.

**{¶57}** A review of the docket shows that IVS paid a deposit for jury demand on April 26, 2013, the same day as the telephone conference. Although the deposit is listed on the docket immediately before the court's April 26 judgment entry, the items are not time-stamped so there is no way to tell which came first in time.

**{¶58}** Moreover, even if IVS paid its deposit before the court put on its judgment entry striking the jury demand, the deposit was still untimely. The court's order made clear IVS was to pay the jury deposit no later than the date of the final pretrial. The final pretrial was held on April 11. And IVS still did not file proposed jury instructions, proposed interrogatories, and verdict forms. Thus, IVS failed to comply

with the court's order pertaining to its jury demand. For these reasons, the trial court did not abuse its discretion in striking the jury demand.

{¶59} Accordingly, IVS's second assignment of error is without merit.

{¶60} Next, we must address Kuhel's cross appeal. Kuhel raises two cross-assignments of error, the first of which states:

THE TRIAL COURT'S VERDICT IN FAVOR OF IVS ON ITS CLAIM FOR CONVERSION WAS CONTRARY TO THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶61} Kuhel argues that the property subject to IVS's conversion claim was not identifiable, personal property. Instead, he claims the property is money IVS claims is due and owing to it. Because a claim for conversion requires the taking of identifiable, personal property, Kuhel argues IVS's claim had to fail. He goes on to argue that IVS was not the owner of the gas that the trial court found he converted. Kuhel states that he purchased gasoline on January 4, 2010, to replenish gas used for previous work-related travels and in contemplation of his continued employment with IVS. He then decided on January 5, to resign and used this gas to travel 150 miles round-trip to deliver his resignation letter and return supplies to IVS. Thus, he contends, there was no conversion of the gasoline.

{¶62} Additionally, Kuhel asserts IVS's conversion claim is based on the same actions as its breach of contract claim. He argues the breach of contract does not create a tort claim.

{¶63} Conversion is "the wrongful control or exercise of dominion over the property belonging to another inconsistent with or in denial of the rights of the owner." *Tabar v. Charlie's Towing Serv., Inc.*, 97 Ohio App.3d 423, 427-428, 646 N.E.2d 1132 (8th Dist.1994). On a conversion action, the property owner must prove that (1) he or she demanded the return of the property from the possessor after the possessor exerted dominion or control over the property, and (2) the possessor refused to return the property to the owner. *R.G. Engineering v. Mfg. Rance*, 7th

Dist. No. 01-CO-12, 2002-Ohio-5218, ¶89, citing *Tabar*.

**{¶64}** In addition to the evidence set out in IVS's first assignment of error, we must consider the following evidence.

**{¶65}** Kuhel testified that he put 27 gallons of gas into his vehicles on January 4, 2010. (Tr. 487). He stated that while he was considering terminating his employment with IVS at that point, he had not yet actually decided to quit. (Tr. 487-488). On January 5, he tendered his resignation letter. (Tr. 488). Kuhel stated that he did not offer to pay IVS for the gas he had recently purchased. (Tr. 489). He testified that he did not consider the recently purchased gas as belonging to IVS because it replaced his gas that he had used at the start of his employment. (Tr. 490).

**{¶66}** On January 11, 2010, Clark sent Kuhel a letter stating that any charges Kuhel made on the gas card after January 1, 2010, were not authorized and Kuhel was responsible for repayment of these charges. (Ex. 12B). On January 4, 2010, Kuhel purchased approximately 27 gallons of gas totaling $75. (Ex. 3B).

**{¶67}** The failure to reimburse IVS for the January 4 gas purchase was the only act of conversion the trial court found. The court concluded that since the return of gas was not possible, IVS's demand for reimbursement was the legal equivalent of demanding return of the property being withheld from the lawful owner. And it noted there was no evidence that Kuhel reimbursed IVS for the $75 purchase. The court also noted there was no evidence as to how many gallons of gas Kuhel's vehicles possessed at the start of his employment. Therefore, the court granted judgment in IVS's favor in the amount of $75 plus interest.

**{¶68}** The evidence supports the trial court's judgment. The evidence was clear that Kuhel purchased $75 in gas on January 4, and that he resigned on January 5. The evidence was also clear that IVS demanded reimbursement and that Kuhel did not pay. The only conflict in the evidence was whether Kuhel was entitled to fill up his vehicles before resigning in order to make up for gas he may have used at the start of his employment. However, as the trial court found, there was no evidence as

to how much gas was in Kuhel's vehicles when he began his employment.

**{¶69}** The measure of damages in a conversion action is the value of the property at the time it was converted. *Tabar*, 97 Ohio App.3d at 428. The court relied on the January 4 gas receipt to reach its $75 award. Therefore, the trial court's award is supported by competent, credible evidence.

**{¶70}** Accordingly, Kuhel's first cross assignment of error is without merit.

**{¶71}** Kuhel's second cross-assignment of error states:

THE TRIAL COURT ERRED IN OVERRULING CROSS-APPELLANT'S CLAIM FOR FRIVOLOUS CONDUCT UNDER R.C. 2323.51.

**{¶72}** Kuhel contends here that IVS's gasoline audit was defective for numerous reasons including omitting numerous nursing visits, not including times spent retrieving supplies from IVS, failing to consider cancelled jobs, misstating the dates of gasoline purchases, not taking into account the exact routes Kuhel took, and failing to account for training other employees. Kuhel asserts that IVS had possession of a log that listed all of his jobs. He claims this log contained 83 of the 85 jobs allegedly omitted from the gasoline audit. Kuhel asserts that IVS failed to produce this log during discovery, which he claims would have exonerated him. Therefore, Kuhel argues IVS acted with the intent to deceive when it submitted the gasoline audit to the court and withheld exculpatory evidence from him. As such, Kuhel argues the trial court erred in overruling his claim for frivolous conduct.

**{¶73}** Pursuant to R.C. 2323.51(B), a court may award court costs, reasonable attorney fees, and other reasonable expenses incurred in connection with a civil action to any party to the civil action that was adversely affected by frivolous conduct. R.C. 2323.51(A)(2)(a) defines "frivolous conduct" as including conduct of a party to a civil action or conduct of the party's counsel that satisfies any of the following:

(i) It obviously serves merely to harass or maliciously injure another party to the civil action or appeal or is for another improper purpose, including, but not limited to, causing unnecessary delay or a needless increase in the cost of litigation.

(ii) It is not warranted under existing law, cannot be supported by a good faith argument for an extension, modification, or reversal of existing law, or cannot be supported by a good faith argument for the establishment of new law.

(iii) The conduct consists of allegations or other factual contentions that have no evidentiary support or, if specifically so identified, are not likely to have evidentiary support after a reasonable opportunity for further investigation or discovery.

(iv) The conduct consists of denials or factual contentions that are not warranted by the evidence or, if specifically so identified, are not reasonably based on a lack of information or belief.

**{¶74}** When the facts under a "legally groundless claim" are in dispute on a claim for frivolous conduct, there is a mixed question of law and fact. *Bryan v. Bryan*, 161 Ohio App.3d 454, 2005-Ohio-2739, 830 N.E.2d 1216, ¶9 (1st Dist.). We will not disturb the trial court's factual findings if they are supported by competent, credible evidence. *Id.*

**{¶75}** In this case, the trial court entered a judgment on one of IVS's five claims. Moreover, on the other four claims, the evidence weighed nearly even on each side. Because the burden was on IVS, the court ruled in Kuhel's favor. But this was a close case. We cannot conclude the case was not warranted under the law or was merely meant to harass Kuhel.

**{¶76}** Accordingly, Kuhel's second cross assignment of error is without merit.

**{¶77}** For the reasons stated above, the trial court's judgment is hereby affirmed.

Vukovich, J., concurs.

Waite, J., concurs.