[Cite as *LaBounty v. Big 3 Automotive*, 2019-Ohio-1919.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
OTTAWA COUNTY

Edward LaBounty

Appellee

v.

Big 3 Automotive, et al.

Appellants

Court of Appeals No. OT-18-022

Trial Court No. 16CV99

**DECISION AND JUDGMENT**

Decided:  May 17, 2019

* * * * *

John A. Coppeler, for appellee.

Jason L. Carter, for appellants.

* * * * *

**ZMUDA, J.**

## I.  Introduction

{¶ 1} Appellants, Big 3 Automotive and Rick Trunkett,[1] appeal the judgment of the Ottawa County Court of Common Pleas, finding in favor of appellee, Edward

---

[1] Trunkett is one of three co-owners of Big 3 Automotive.

LaBounty, on his claims for breach of contract and misrepresentation against Big 3 Automotive, dismissing appellee's remaining claims as well as appellants' counterclaims, and awarding damages to appellee in the amount of $75,253.60.

## A. Facts and Procedural Background

{¶ 2} This matter originated upon the filing of appellee's complaint on April 4, 2016. In his complaint, appellee alleged claims against Big 3 Automotive for breach of contract, negligence, breach of express and implied warranties, misrepresentation, and violations of the Consumer Sales Practices Act. Additionally, appellee brought a claim of misrepresentation against Trunkett. These claims stemmed from issues that arose during Big 3 Automotive's work on appellee's performance boat engines.

{¶ 3} Three weeks after the complaint was filed, appellants moved the trial court to dismiss the action for improper venue under Civ.R. 12(B). In the motion, appellants argued that the matter was improperly brought in Ottawa County because Big 3 Automotive was located in Medina County, and the transaction that was the subject of the litigation also took place in Medina County. However, because some of the events that gave rise to the complaint were alleged to have occurred in Ottawa County, the trial court denied appellants' motion to dismiss. Thereafter, appellants filed a motion to transfer venue to Medina County, which the trial court likewise denied.

{¶ 4} On October 21, 2016, appellants filed their answer, in which they also asserted counterclaims against appellee for breach of contract, conversion, unjust enrichment, and fraudulent misrepresentation. Thereafter, the matter proceeded through pretrial discovery and motion practice. On September 15, 2017, the trial court issued its

2.

final settlement pretrial order in which it indicated that appellants had not yet paid the required jury deposit, and thus reserved the right to strike their jury demand.

{¶ 5} On September 28, 2017, the trial court issued an order sua sponte striking appellants' jury demand under Loc.R. 20.04, which requires jury deposits to be paid no later than 14 days following the case management conference. According to the docket, the case management conference order was issued on April 26, 2017. Appellants' jury deposit was not paid until September 26, 2017, five months after the case management conference.

{¶ 6} On October 2, 2017, the matter proceeded to a bench trial. At trial, it was established that appellee's relationship with appellants began in 2013, when appellee contacted Big 3 Automotive and requested service of a Holley fuel injection system that was installed on his 1995 Hustler twin-engine boat. Appellee became aware that Big 3 Automotive was a Holley dealer when he found the company's information listed on Holley's website.[2]

{¶ 7} During the 2013 boating season, Big 3 Automotive made the necessary adjustments to the Holley fuel injection system on appellee's boat, resulting in proper performance from the boat's General Motors engines. Appellee was invoiced by Big 3 Automotive, and he subsequently paid the charges in full.

---

[2] Although Big 3 Automotive was a Holley dealer, Trunkett testified at trial that Big 3 Automotive had no experience building marine engines. Trunkett indicated that appellee was aware of Big 3 Automotive's lack of marine experience, but suggested that "[Big 3 Automotive] could probably get into the marine market."

3.

{¶ 8} At the end of the 2013 boating season, appellee contacted Trunkett to inquire about Big 3 Automotive "freshening up" the boat's engines in order to improve their performance and ensure that the engines were in good operating condition for the 2014 boating season.  In order to improve performance, as measured by an increase in the engines' horsepower, Trunkett suggested supercharging the engines and increasing their displacement.[3]  Trunkett testified that he understood that appellee also wanted Big 3 Automotive to replace any parts that were worn excessively.

{¶ 9} Following several conversations with Trunkett, appellee agreed to have Big 3 Automotive freshen up his engines at an approximate cost of $15,000 to $20,000.  To that end, appellee removed the engines from the boat and delivered them to Big 3 Automotive in November 2013.  At that time, Trunkett understood that appellee wished to have the work completed by the following spring, in time for the 2014 boating season.  Trunkett testified that he made no guarantees or promises to have the work done before the 2014 boating season.  However, appellee testified that he and Trunkett had discussed having the engines reinstalled on his boat "before the ice broke" in 2014.

{¶ 10} Once the engines arrived at Big 3 Automotive's shop, the engines were taken apart.  At this point, it was discovered that one of the engines had a crack in its block.  Trunkett informed appellee of the cracked block.  Because General Motors no longer carried a replacement engine block, Trunkett recommended repairing the engine

---

[3] Trunkett explained that an engine's displacement is increased by increasing the stroke of the engine and/or the bore size of the engine.

4.

with a new Dart engine block. Appellee desired to have matching blocks, and therefore decided to replace both General Motors blocks with Dart blocks.

{¶ 11} During the discussions concerning the replacement of the engine blocks, Trunkett provided appellee with an estimate as to the increase in engine horsepower that could be expected as a result of increasing the engine's displacement from 540 cubic inches to 621 cubic inches and upgrading the camshafts. In their original state, the engines each produced approximately 700 horsepower. The testimony at trial provided conflicting accounts as to how much additional horsepower would be obtained following Big 3 Automotive's work on the engines. Trunkett testified that he informed appellee that the performance would improve by "up to a hundred horsepower." Appellee, however, testified that Trunkett told him that the engines would put out "at least a hundred horsepower or more."

{¶ 12} In the months that followed, Big 3 Automotive performed a variety of work on appellee's engines. According to Trunkett, one of the engines (the "port engine") experienced three failures. The first failure, a broken valve, was characterized by Trunkett as a "catastrophic failure" that caused significant damage to the engine. Big 3 Automotive attempted to repair the damage that was caused by the broken valve by replacing a rod, a piston, and a cylinder head. Additionally, Big 3 Automotive performed rewiring work on the engines.

{¶ 13} After repairing the damage caused by the broken valve, Big 3 Automotive took the engines to Edgewater Marina for testing. During testing, the valve on the port

5.

engine that was repaired failed a second time. The valve was repaired, and the engines were taken to Lakefront Marina for testing.

{¶ 14} While at Lakefront Marina, Trunkett attempted to test the engines. After starting the engines, Trunkett noticed that the port engine was misfiring. Once appellee arrived at the marina, Trunkett informed appellee that he was unsure why the port engine failed for a third time and that he needed to get a second opinion. Trunkett indicated that he would need to take the engines to Ison Racing, a company with which he had a relationship. Appellee responded that he wanted to consider the matter before making a decision.

{¶ 15} Thereafter, appellee researched Ison Racing, and determined that he was not comfortable taking the engines there because the company was primarily experienced in automotive engines. Instead of Ison Racing, appellee wanted to take the engines to Sterling Performance, a Michigan-based company that specializes in performance marine engines. Trunkett responded that he would not pay for appellee to take the engines to Sterling Performance. Further, Trunkett told appellee that he was "washing [his] hands of it if [appellee] took it [to] someone else."

{¶ 16} Sometime later, appellee informed Trunkett that he would be taking the engines to Sterling Performance. Trunkett was invited to be present at Sterling Performance to witness the disassembly of the engines, but refused to attend.

{¶ 17} Once at Sterling Performance, the engines were examined by Michael D'Anniballe. D'Anniballe is the president of Sterling Performance. At trial, D'Anniballe testified as to his background. D'Anniballe stated that he was educated as a

6.

mechanical engineer. D'Anniballe worked as an engineer for McClaren until he was contacted by Mercury Marine, a marine engine company, and asked to design and build a race engine. At some point thereafter, D'Anniballe started Sterling Performance. According to D'Anniballe, Sterling Performance has become the "predominant supplier for offshore racing worldwide."

{¶ 18} Upon examination of appellee's engines, D'Anniballe prepared a written evaluation and emailed it to appellee on September 11, 2014. In his evaluation of the port engine, D'Anniballe stated:

> We feel that the initial failure of a bent #7 exhaust valve was caused by a combination of a tight fitting exhaust guide along with the engine overheating. The overheating is caused by the wrong style thermostat being installed. * * *
>
> When we disassembled the engine, we found the following problems that would have led to additional failures later.
>
> A. Pistons sticking .010" out of bore
>
> B. Pistons hitting cylinder heads
>
> C. Compression ratio way [too] high for the iron heads running pump fuel
>
> D. Poly locks on rocker arms have only marginal engagement on rocker studs
>
> There are other items that are suspect in our opinion. These items may or may not cause failure but in the long term would hinder reliability.

7.

A. Crankshaft type and stroke

B. Connecting rod type and length

C. Piston type is fine but the layout is not

D. Valve length

E. Pushrod length

After running the 2nd engine we found the base calibration to be very rough. The CAL relied heavily on the O2 sensors to correct. The problem with the above is that the system cannot react quickly enough. This would become evident at idle when trying to shift boat in and out of gear.

{¶ 19} During his testimony, D'Anniballe elaborated on the issue of engine overheating, stating that an automotive thermostat was used instead of a marine thermostat. D'Anniballe explained that a marine thermostat is designed differently than an automotive thermostat and that an automotive thermostat, which lacks the fluid bypass present on a marine thermostat, is unable to properly detect the engine's temperature in marine applications, leading to overheating. According to D'Anniballe, "the engine overheats, but the thermostat doesn't know it." After disassembling the second engine (the "starboard engine"), D'Anniballe observed that it was built in a similar fashion to the port engine. Ultimately, D'Anniballe testified that both of appellee's engines were improperly configured, making them unable to endure the type of extended, high-load marine application for which they were being used.

8.

{¶ 20} In light of D'Anniballe's findings, appellee directed Sterling Performance to rebuild the engines. The engines were then rebuilt by Sterling Performance at a cost of $41,956.53. An invoice from Sterling Performance was introduced at trial, which details the work that was performed on the engines during the rebuilding process. D'Anniballe testified that the work contained in the invoice was "necessary to change the engine and reconfigure it into a fashion that it would survive for [appellee's] intended usage." Further, D'Anniballe stated that he utilized whatever existing components that remained suitable during the rebuild process, and supplemented the existing components with new parts. Appellee indicated during his testimony that the parts that were installed and later removed from the engines were offered to, and refused by, Trunkett. Appellee further stated that the parts are currently stored in his garage, and are of no value to him.

{¶ 21} After D'Anniballe testified as to the necessity of the work performed by Sterling Performance, appellee's counsel asked whether D'Anniballe had an opinion, to a reasonable degree of professional certainty, whether or not the engines were suitable for use in a performance boat upon their arrival from Big 3 Automotive. Appellants' counsel objected, stating as his basis: "Foundation for what he is trying to elicit as expert testimony with respect to the status of the engines." The trial court overruled the objection, noting that D'Anniballe's foundation for his opinion as to the condition of the engines was provided throughout his testimony up to that point. Thereafter, D'Anniballe testified that, in his opinion, appellee's engines were not suitable for use in a performance boat when they arrived at Sterling Performance. On redirect examination, D'Anniballe

9.

further provided his opinion that, to a reasonable degree of professional certainty, the starboard engine would have eventually failed, just as the port engine had failed, due to the fact that it was configured in a similar fashion to the port engine.

{¶ 22} Following the changes made by Sterling Performance to the engines, which made the engines suitable for the prolonged period of operation inherent in marine applications, the horsepower output from the engines decreased. Consequently, appellee testified that he returned to Sterling Performance to have further work done on the engines in order to "achieve the horsepower that [he] thought [he] was getting originally [from Big 3 Automotive]." Ultimately, Sterling Performance installed superchargers on the engines at a cost of $44,578.20, increasing the horsepower of each engine by between 220 and 230 horsepower. An invoice detailing these charges, dated April 21, 2016, was admitted at trial.

{¶ 23} At the conclusion of the trial, the court took the matter under advisement and ordered the parties to submit proposed findings of fact and conclusions of law. On May 31, 2018, the court issued its decision in which it found in appellee's favor on his claims for breach of contract and misrepresentation against Big 3 Automotive. The court rejected appellee's remaining claims, and found in favor of appellee on appellants' counterclaims.

### B.  Assignments of Error

{¶ 24} Appellants have filed a timely notice of appeal, and now assert the following assignments of error:

10.

**FIRST ASSIGNMENT OF ERROR:** Whether the lower court's ruling that Big 3 breached its contract with LaBounty is against the manifest weight of the evidence.

**SECOND ASSIGNMENT OF ERROR:** Whether the lower court erred when it failed to apply Big 3's warranty disclaimer to LaBounty's claims for recovery against the manifest weight of the evidence.

**THIRD ASSIGNMENT OF ERROR:** Whether the lower [court] erred when ruling Big 3 failed to cure the defects in the "port" engine as against the manifest weight of the evidence.

**FOURTH ASSIGNMENT OF ERROR:** Whether the lower court erred when finding Big 3's actions amounted to tortious misrepresentation against the manifest weight of the evidence.

**FIFTH ASSIGNMENT OF ERROR:** Whether the lower court erred when determining the damage award against Big 3 against the manifest weight of the evidence.

**SIXTH ASSIGNMENT OF ERROR:** Whether the lower court abused its discretion when determining the admissibility of various exhibits.

**SEVENTH ASSIGNMENT OF ERROR:** Whether the lower court abused its discretion when treating the testimony of [D'Anniballe] as expert testimony.

11.

EIGHTH ASSIGNMENT OF ERROR: Whether the lower court abused its discretion when denying Big 3's request for change of venue and a trial by jury.

[NINTH] ASSIGNMENT OF ERROR: Whether the lower court's dismissal of the claims raised by Big 3 was in error and against the manifest weight of the evidence.

TENTH ASSIGNMENT OF ERROR: Whether the lower court abused its discretion when it failed to give proper weight to the presence of witness tampering in the trial process.

{¶ 25} For ease of discussion, we will address appellants' assignments of error out of order. We will begin by addressing the preliminary procedural issues appellants raise in their eighth assignment of error. We will then examine appellants' assertion of witness tampering found in their tenth assignment of error. Thereafter, we will address the evidentiary issues raised in appellants' sixth and seventh assignments of error. Lastly, we will address appellants' remaining assignments of error, which are based upon a claim that the trial court's decision was against the manifest weight of the evidence.

## II. Analysis

### A. Venue and Procedural Issues

{¶ 26} In appellants' eighth assignment of error, they argue that the trial court abused its discretion by denying their motion for a change of venue and striking their jury demand.

**{¶ 27}** "The decision to grant or deny a motion to change venue is within the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion." *Sheet Metal Workers Local 98, Pension Fund v. Whitehurst*, 5th Dist. Knox No. 03 CA 29, 2004-Ohio-191, ¶ 23, citing *Grenga v. Smith*, 11th Dist. Trumbull No. 2001-T-0040, 2002-Ohio-1179. An abuse of discretion connotes that the trial court's attitude is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

**{¶ 28}** The proper venue in a civil action is determined by reference to Civ.R. 3(C), which provides, in relevant part:

> Any action may be venued, commenced, and decided in any court in any county. * * * Proper venue lies in any one or more of the following counties:
>
> (1) The county in which the defendant resides;
>
> (2) The county in which the defendant has his or her principal place of business;
>
> (3) A county in which the defendant conducted activity that gave rise to the claim for relief;
>
> * * *
>
> (6) The county in which all or part of the claim for relief arose
>
> * * *.

{¶ 29} The Supreme Court of Ohio has held that these provisions "are on equal status, and any court specified therein may be a proper and initial place of venue." *Morrison v. Steiner*, 32 Ohio St.2d 86, 89, 290 N.E.2d 841 (1972). Plaintiff may choose where to bring the action if any of the counties specified in Civ.R. 3(C)(1) through (11) are a proper forum under the facts of the case. *Varketta v. Gen. Motors Corp.*, 34 Ohio App.2d 1, 6, 295 N.E.2d 219 (8th Dist.1973).

{¶ 30} In support of their contention that the trial court abused its discretion in denying their motion to transfer venue, appellants cite *Rose v. Cochran*, 2d Dist. Montgomery No. 25498, 2013-Ohio-3755, for the proposition that venue in this case should have been chosen in the county in which they reside (Medina County), rather than appellee's county of residence. Our review of *Rose* reveals that it is distinguishable from the case at bar.

{¶ 31} In *Rose*, the Second District found that venue was improper in Ross County, where the plaintiff resided. Instead, the court found that the county in which the defendant resides (Montgomery County) should have been selected over Ross County under Civ.R. 3 because "[t]he case had no other ties to Ross County * * *."

{¶ 32} Unlike *Rose*, the present case has ample ties to Ottawa County. For example, the verbal contracts that were formed in this case were agreed upon in Ottawa County. Further, the third failure of the port engine occurred in Ottawa County, which is where Trunkett informed appellee that he would need to get a second opinion, prompting appellee to take the engines to Sterling Performance. Given appellants' activity in Ottawa County, and in light of the fact that part of appellee's claim arose in Ottawa

14.

County, we find that Ottawa County was a proper venue under Civ.R. 3(C)(3) and (6), and the trial court did not abuse its discretion in denying appellants' request to transfer venue.

{¶ 33} Next, appellants argue that the trial court abused its discretion in sua sponte striking their jury demand for failure to timely pay the jury deposit under the trial court's local rules.

{¶ 34} Relevant here, Ottawa County Common Pleas Court Local Rule 20.04 provides:

> Unless otherwise [o]rdered by this Court, jury deposits shall be paid no later than 14 days following the Case Management Conference. Failure to timely pay the jury deposit may result in the jury demand being stricken, the jury trial date being vacated and the matter rescheduled for bench trial.

{¶ 35} In their brief to this court, appellants fail to reference the foregoing rule or explain whether their September 26, 2017 remittance of the jury deposit was in compliance with the rule. Our examination of the record reveals that the case management conference order in this case was issued on April 26, 2017. Thereafter, the trial court informed appellants on September 15, 2017, that it reserved the right to strike their jury demand. Nonetheless, appellants failed to remit the jury deposit until September 26, 2017, five months after the case management conference and only six days before trial, and thus well beyond the 14-day period prescribed under the trial court's local rule.

15.

**{¶ 36}** In light of appellants' untimely payment of the jury deposit, we find that the trial court did not abuse its discretion in sua sponte striking the jury demand. *Skiadas v. Finkbeiner*, 6th Dist. Lucas No. L-05-1094, 2007-Ohio-3956, ¶ 30; *Integrated Vascular Servs., LLC v. Kuhel*, 7th Dist. Columbiana No. 13 CO 43, 2014-Ohio-5716, ¶ 58. Having already concluded that the trial court did not abuse its discretion in denying appellants' request to transfer venue, we find appellants' eighth assignment of error not well-taken.

### B. Allegations of Witness Tampering

**{¶ 37}** In appellants' tenth assignment of error, they argue that the trial court abused its discretion by failing to give proper weight to their allegations that appellee's counsel committed witness tampering by advising D'Anniballe that he did not need to respond to Big 3 Automotive's subpoena. According to their brief, this communication between D'Anniballe and appellee's counsel "was improper and deserve[s] the attention of this Court and the lower court."

**{¶ 38}** The subpoena at issue was originally filed on October 24, 2016. Receiving no response to the subpoena, appellants filed a "motion for court order" on February 17, 2017, in which they sought an order of the court directing Sterling Performance to respond. One week later, the court denied appellants' motion, explaining that it could not compel Sterling Performance to comply with the subpoena because it is a Michigan-based company over which the court had no jurisdiction.[4] During cross examination,

---

[4] Appellee did not file a memorandum in opposition to appellants' motion for court order.

16.

appellants asked D'Anniballe why he failed to respond to their subpoena. D'Anniballe responded that he was informed by appellees' counsel that he did not need to respond to the subpoena. No further mention was made of the interaction between D'Anniballe and appellee's counsel pertaining to the subpoena, and no motion to strike was made by appellants' counsel.

{¶ 39} Having reviewed the record in its entirety, it is clear that appellants failed to raise the issue of witness tampering in the trial court. Thus, appellants have waived this argument on appeal. *See Robinson v. Mercy St. Vincent Med. Ctr.*, 6th Dist. Lucas No. L-17-1102, 2018-Ohio-2030, ¶ 40, citing *Estate of Hood v. Rose*, 153 Ohio App.3d 199, 2003-Ohio-3268, 792 N.E.2d 736, ¶ 10 (4th Dist.) ("A litigant's failure to raise an issue before the trial court waives that party's right to raise the issue on appeal.").

{¶ 40} Accordingly, appellants' tenth assignment of error is not well-taken.

### C. Hearsay and the Business Records Exception

{¶ 41} In appellants' sixth assignment of error, they argue that the trial court abused its discretion by admitting two invoices, exhibits 16 and 17, at trial without a proper foundation under Evid.R. 803(6). In response, appellee asserts, as he did before the trial court, that the invoices were not hearsay under Evid.R. 801(C) and, thus, did not require the laying of a foundation by a custodian or other qualified witness under Evid.R. 803(6).

{¶ 42} "On appeal, challenged hearsay is subject to de novo review under the applicable hearsay rule, rather than the more deferential review employed for discretionary rulings" because "[w]hile there is discretion to admit or exclude relevant

17.

evidence, there is no 'discretion' to admit hearsay." *State v. Richcreek*, 196 Ohio App.3d 505, 2011-Ohio-4686, 964 N.E.2d 442, ¶ 29, 32 (6th Dist.), citing *State v. Sutorius*, 122 Ohio App.3d 1, 7, 701 N.E.2d 1 (1st Dist.1997); and *State v. Sorrels*, 71 Ohio App.3d 162, 165, 593 N.E.2d 313 (1st Dist.1991).

{¶ 43} Here, the evidence contained in exhibits 16 and 17 consisted of invoices from Art Cook Marine Services, Inc. and Orlandi Performance LLC, respectively, which detailed expenses incurred by appellee for the removal and reinstallation of the engines. At trial, these exhibits were used to support appellee's testimony that he paid $4,417.37 to Art Cook Marine Services, Inc. and $7,879.70 to Orlandi Performance LLC. As a threshold issue, we must determine whether appellee is correct in his assertion that exhibits 16 and 17 were not hearsay.

{¶ 44} Under Evid.R. 801(C), hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."

{¶ 45} In *League v. Collins*, 12th Dist. Butler No. CA2013-03-041, 2013-Ohio-3857, the Twelfth District addressed the question of whether an attorney's invoice, which detailed $965 of legal fees incurred by League in defense of a motion for contempt, amounted to hearsay. There, the court held that the invoice was hearsay because it was used "to prove, in part, the truth of the matters asserted within it; that League incurred $965 in attorney fees in defense of the contempt motion." *Id.* at ¶ 10.

{¶ 46} Likewise, the invoices contained in exhibits 16 and 17 were used by appellee to prove not only that he incurred expenses for work performed by Art Cook

18.

Marine Services, Inc. and Orlandi Performance LLC, but also that the cost of the work, which he subsequently paid, was as specified on the invoices. Because appellee offered the invoices to prove the truth of the matters asserted therein, namely that the work was performed and the cost incurred, the invoices constituted hearsay.

{¶ 47} Appellee cites our decision in *Rizzen v. Spaman*, 106 Ohio App.3d 95, 665 N.E.2d 283 (6th Dist.1995), to support his assertion that the invoices in this case were not hearsay. However, we find *Rizzen* distinguishable because, in that case, the plaintiff testified that she spent over $50,000 on attorney fees. *Id.* at 110. That testimony was supported by attorney invoices and copies of checks, which we deemed were not hearsay under the facts of that case. *Id.*

{¶ 48} By contrast, appellee provided no testimony in this case as to the amount of money he paid to Art Cook Marine Services, Inc. and Orlandi Performance LLC. Rather, appellee relied exclusively upon exhibits 16 and 17 to establish the amount paid and that the work was performed. When addressing the costs contained in exhibit 16, the following exchange took place:

> Q. Did you receive this invoice from Art Cook Marine Services?
>
> Yes.
>
> Q. Did you pay it?
>
> I did. It says paid in full.

{¶ 49} Similarly, appellee failed to provide any admissible testimony as to the cost of the work provided by Orlandi Performance LLC. Without any independent testimony or other admissible evidence establishing the work performed or appellee's payments to

Art Cook Marine Services, Inc. and Orlandi Performance LLC, it is clear that appellee was introducing the invoices in order to substantiate the validity of his claim that he had paid $4,417.37 to Art Cook Marine Services, Inc. and $7,879.70 to Orlandi Performance LLC.  The exhibits, having been offered to prove the truth of the matters asserted therein and support appellee's claim of damages, are clearly hearsay, and are therefore inadmissible under Evid.R. 802 unless they fall within one of the hearsay exceptions.

{¶ 50} Evid.R. 803 provides certain exceptions to the rule against hearsay. Business records are among these exceptions.

{¶ 51} Relevant here, and as argued by appellee, Evid.R. 803(6) provides, in pertinent part:

> The following are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness:
>
> (6) Records of regularly conducted activity.  A memorandum, report, record, or data compilation, in any form, of acts, events, or conditions, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness or as provided by Rule 901(B)(10), unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.

20.

{¶ 52} The Supreme Court of Ohio has held that the business record exception "is based on the assumption that the records, made in the regular course of business by those who have a competent knowledge of the facts recorded and a self-interest to be served through the accuracy of the entries made and kept with knowledge that they will be relied upon in a systematic conduct of such business, are accurate and trustworthy." *Weis v. Weis*, 147 Ohio St. 416, 425-426, 72 N.E.2d 245 (1947). In order to lay a proper foundation for business records under Evid.R. 803(6), "the testifying witness must possess a working knowledge of the specific record-keeping system that produced the document." *State v. Davis*, 62 Ohio St.3d 326, 342, 581 N.E.2d 1362 (1991).

{¶ 53} In this case, appellee failed to lay a proper foundation for the invoices contained in exhibits 16 and 17. Indeed, appellee was the only witness to testify concerning the invoices. Appellee was not the custodian or a qualified witness because he did not possess any knowledge whatsoever as to the record-keeping system that produced the invoices. Without a proper foundation under Evid.R. 803(6), the trial court erred in admitting exhibits 16 and 17 into evidence. *See League, supra,* 12th Dist. Butler No. CA2013-03-041, 2013-Ohio-3857, at ¶ 10 (attorney fee invoice was not authenticated by League's attorney and was therefore inadmissible under business records exception). By extension, we find that the trial court's award of damages for the payments made to Art Cook Marine Services, Inc. and Orlandi Performance LLC (totaling $12,297.07) must be vacated, as it was based exclusively upon the erroneously admitted invoices contained in exhibits 16 and 17.

{¶ 54} Accordingly, appellants' sixth assignment of error is well-taken.

21.

## D. Expert Testimony

**{¶ 55}** In appellants' seventh assignment of error, they argue that the trial court abused its discretion by treating D'Anniballe's testimony as expert testimony.

**{¶ 56}** Trial courts have broad discretion in determining the admissibility of expert testimony. *State v. Adams*, 103 Ohio St.3d 508, 2004-Ohio-5845, 817 N.E.2d 29, ¶ 88. Thus, an appellate court will only reverse a ruling admitting such testimony if the trial court abused its discretion. *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, ¶ 161.

**{¶ 57}** Evid.R. 702 governs the admissibility of expert testimony, and permits such testimony so long as the following criteria are satisfied:

(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;

(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony; [and]

(C) The witness' testimony is based on reliable scientific, technical, or other specialized information.

**{¶ 58}** Appellants raise two issues under Evid.R. 702. First, appellants argue that the trial court improperly allowed D'Anniballe to testify without first qualifying him as an expert under Evid.R. 702(B). In response, appellee asserts that D'Anniballe was qualified to provide expert testimony in this case based upon his 31 years of experience

designing, developing, and testing marine engines for performance boats, as outlined in the curriculum vitae that was admitted into evidence at trial.

{¶ 59} Our review of the record in this case reveals that appellee did not ask the trial court to formally recognize D'Anniballe as an expert prior to eliciting his opinion testimony. "While it is preferable for the trial court to explicitly find that a witness qualifies as an expert, where the testimony of a witness relates to knowledge beyond the scope of a lay person, we can infer from the record that the trial court found the witness to be an expert, and the question thus becomes whether the witness was properly qualified as an expert." *State v. Michalek*, 5th Dist. Stark No. 2010CA00186, 2011-Ohio-1628, ¶ 34. In order to qualify as an expert, an expert must "demonstrate some knowledge on the particular subject superior to that possessed by an ordinary juror." *Scott v. Yates*, 71 Ohio St.3d 219, 221, 643 N.E.2d 105 (1994), citing *State Auto Mut. Ins. Co. v. Chrysler Corp.*, 36 Ohio St.2d 151, 160, 304 N.E.2d 891 (1973).

{¶ 60} Here, D'Anniballe testified regarding his background as a mechanical engineer, and explained that he had extensive experience modifying performance marine engines for Mercury Marine and Sterling Performance. This experience, which was further outlined in D'Anniballe's curriculum vitae, informed D'Anniballe's opinion that the engines, as modified by Big 3 Automotive, were unsuitable for use in appellee's performance boat.

{¶ 61} In light of D'Anniballe's knowledge of performance marine engines, which clearly exceeded that of an ordinary juror given his experience, we find that D'Anniballe

23.

was qualified to testify as an expert in this matter under Evid.R. 702(B).  *See Chrysler* (finding that a mechanic who had seen ruptured brake hoses on thirty occasions was qualified to testify as to a defect in a brake hose).

{¶ 62} Second, appellants argue that the trial court erred in allowing D'Anniballe to testify as an expert without first inquiring into the reliability of his opinion testimony under Evid.R. 702(C).  Appellants take specific issue with the trial court's failure to engage in a *Daubert* analysis before permitting D'Anniballe to testify.  Notably, appellants made no mention of *Daubert* in support of their objection before the trial court, nor did they seek to voir dire D'Annniballe as to his qualifications.  Nonetheless, appellants contend that a *Daubert* analysis was required because D'Anniballe's testimony was not supported by specific literature.  Appellee responds that D'Anniballe's testimony was admissible because it was based on reliable technical or specialized information.  Upon consideration, we find that appellants' argument misconstrues the application of *Daubert* in this case.

{¶ 63} In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the United States Supreme Court listed several factors to be considered in determining the reliability of scientific evidence.  These factors include (1) whether the theory or scientific technique has been tested, (2) whether the theory or technique has been subject to peer review or publication, (3), whether the method has a known or potential rate of error, and (4) whether the method has gained general

24.

acceptance in the scientific community. *Id.* at 593-594. The Ohio Supreme Court adopted the *Daubert* standard in *Miller v. Bike Athletic Co.*, 80 Ohio St.3d 607, 687 N.E.2d 735 (1998).

{¶ 64} Thereafter, the United States Supreme Court clarified that the *Daubert* standard of evidentiary reliability extends not only to scientific testimony, but to all expert testimony. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147-149, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). The reliability inquiry is a flexible one, and the specific factors enumerated in *Daubert* do not all necessarily apply in every instance. *Id.* at 150-151. Thus, scientific studies are not the exclusive means to establish reliability under *Daubert*. Rather, "the relevant reliability concerns may focus upon personal knowledge or experience." *Id.* at 150.

{¶ 65} Here, the reliability inquiry focused on D'Anniballe's personal knowledge or experience, which he explained in detail prior to rendering an opinion regarding the condition of appellee's engines. As noted above, the factors outlined in *Daubert*, and cited by appellants in their brief, do not apply in every case. D'Anniballe's testimony was not based upon the sort of novel scientific theories or methods that would be subject to peer review or need to be carefully scrutinized by a trial court under *Daubert*.

{¶ 66} Given the personal knowledge gleaned from D'Anniballe's experience developing and testing performance marine engines, we find that D'Anniballe's expert testimony was reliable under Evid.R. 702(C). Having already concluded that D'Anniballe was properly qualified under Evid.R. 702(B), we find appellants' seventh assignment of error not well-taken.

25.

## E. Manifest Weight

{¶ 67} In their first, second, third, fourth, fifth, and ninth assignments of error, appellants argue that the trial court's decision was against the manifest weight of the evidence. When reviewing for manifest weight:

> The court, reviewing the entire record, weighs the evidence and all
>
> reasonable inferences, considers the credibility of witnesses and determines
>
> whether in resolving conflicts in the evidence, the [trier-of-fact] clearly lost
>
> its way and created such a manifest miscarriage of justice that the
>
> conviction must be reversed and a new trial ordered. The discretionary
>
> power to grant a new trial should be exercised only in the exceptional case
>
> in which the evidence weighs heavily against the conviction. *State v.*
>
> *Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997).

{¶ 68} As a preliminary matter, we note that the contract at issue in this case is a hybrid contract involving both goods and services. Thus, we must address whether this appeal is governed by common law contract principles or by Article Two of the Uniform Commercial Code ("UCC"), as codified in Chapter 1302 of the Ohio Revised Code. To do so, we utilize the "predominant purpose" test, which was explained by the court in *Allied Indus. Serv. Corp. v. Kasle Iron & Metals*, 62 Ohio App.2d 144, 405 N.E.2d 307 (6th Dist.1977), as follows:

> The test for the inclusion in or the exclusion from sales provisions
>
> [of Article Two of the UCC] is whether the predominant factor and purpose
>
> of the contract is the rendition of service, with goods incidentally involved,

26.

or whether the contract is for the sale of goods, with labor incidentally involved.

*Id.* at 144.

{¶ 69} Here, the contract is predominantly one for goods. Appellee solicited the services of Big 3 Automotive with an interest in having his engines "freshened up," which was understood by the parties to mean that the performance of the engines would be improved with the addition of performance parts. As the matter developed, it was discovered that one of the engines had a cracked block, which required the installation of even more parts than were initially projected. Indeed, of the total invoice price of approximately $27,000, over $21,000 of the cost was attributable to parts. Thus, we find that Big 3 Automotive's installation of the parts was incidental to the sale of the performance parts. In other words, it was the parts (which are goods), and not the installation services, that appellee was ultimately seeking in this agreement. As such, Article Two of the UCC applies. *See Allied Erecting & Dismantling Co. v. Ohio Edison Co.*, 2015-Ohio-2328, 34 N.E.3d 182 (7th Dist.) (finding that Article Two of the UCC applies to a contract obligating Ohio Edison to design and construct an electrical substation because the predominant purpose of the contract was to secure a working substation, not to utilize Edison's design and construction expertise).

### 1. Breach of Contract

{¶ 70} In appellants' first assignment of error, they argue that the trial court's determination that Big 3 breached its contract with appellee was against the manifest weight of the evidence. Relatedly, appellants argue in their third assignment of error that

27.

the trial court's judgment was against the manifest weight of the evidence because the record reveals that appellee prevented them from exercising their right to cure the defect in the port engine.

{¶ 71} In order to establish a claim for breach of contract, appellee must prove by a preponderance of the evidence: "(1) a contract existed, (2) [appellee] fulfilled his obligations, (3) [appellants] failed to fulfill [their] obligations, and (4) damages resulted from that failure." *Bank of New York Mellon v. Lewis*, 6th Dist. Erie No. E-13-051, 2014-Ohio-5599, ¶ 81, citing *Blake Homes, Ltd. v. FirstEnergy Corp.*, 173 Ohio App.3d 230, 2007-Ohio-4606, 877 N.E.2d 1041, ¶ 77 (6th Dist.).

{¶ 72} In the present case, appellants do not dispute that a contract existed between the parties. Instead, appellants argue that there was no evidence to establish that they failed to fulfill their obligations under the terms of the contract with respect to the starboard engine, except for D'Anniballe's "unsupported contention" that the starboard engine would have failed in the same manner as the port engine. In support, appellants note that the starboard engine functioned properly prior to being removed and taken to Sterling Performance.

{¶ 73} In response, appellee asserts that appellants' failure to fulfill their obligations under the contract was evident from the record. Appellee states that appellants' work on the boat engines resulted in "repeated failure" due to the use of automotive parts that were unsuitable for marine usage. As to the issue of failure, appellee notes that the engines provided by Big 3 Automotive "did not run, stalled when shifted, and would not even allow the boat to be operated out of the marinas * * *."

28.

{¶ 74} Our review of the record reveals that appellee contracted with appellants in October 2013 in order to improve the performance of his boat engines and replace any excessively worn parts. The parties understood that the improvement in performance would be measured by an increase in horsepower output, although the parties disputed whether Trunkett promised an increase of "up to 100 horsepower," or "at least 100 horsepower." In any event, the record is clear that appellee was contracting for an increase in horsepower (i.e. performance) from his engines.

{¶ 75} In its attempts to produce the promised horsepower gains, Big 3 Automotive performed a variety of services and installed a number of parts. Ultimately, the port engine failed three times. Two of these failures involved a broken valve. The third failure occurred when the engine misfired after startup, prompting Trunkett to inform appellee that he was unsure as to the cause of the misfire.

{¶ 76} Thereafter, appellee took the engines to Sterling Performance, over Trunkett's objection, in order to get a second opinion. Eventually, appellee received a report from Sterling Performance, which explained that the failure of the port engine was due to Big 3 Automotive's installation of an automotive thermostat that was unsuitable for marine applications. At trial, D'Anniballe provided a detailed explanation of Sterling Performance's findings concerning the thermostat, and clarified that both engines were fitted with the same defective automotive thermostat. The use of this thermostat in the starboard engine, according to D'Anniballe's testimony, would have resulted in the same failure that was observed in the port engine.

29.

{¶ 77} In light of the foregoing testimony, we find that the trial court's determination that Big 3 Automotive breached the contract was not against the manifest weight of the evidence. After three attempts at improving the performance of appellee's engines, Big 3 Automotive produced one engine that had failed inexplicably, and another engine that was prone to a similar fate based upon Big 3 Automotive's installation of unsuitable parts. These failures were resolved as a consequence of Sterling Performance's work, and appellants introduced no expert testimony to dispute D'Anniballe's testimony that Sterling Performance's work was necessary.

{¶ 78} Alternatively, appellants assert that they had a right under Chapter 1302 of the Ohio Revised Code to cure the defects in the port engine following the third failure. Appellants claim that they were unable to cure the defects because appellee refused to allow Trunkett to take the engine to Ison Racing, opting instead to take the engines to Sterling Performance.

{¶ 79} The right to cure in this case is set forth in R.C. 1302.52(A), which states:

(A) Where any tender or delivery by the seller is rejected because non-conforming and the time for performance has not yet expired, the seller may seasonably notify the buyer of his intention to cure and may then within the contract time make a conforming delivery.

{¶ 80} The issue here is whether the time for performance had expired by the time of the third failure, thereby eliminating Big 3 Automotive's right to cure. On that issue, the testimony provided at trial indicates that Trunkett understood that appellee wished to have the engines retooled and ready to go by the start of the 2014 boating season. By the

30.

time the engines had failed for a third time, the 2014 boating season had already come to an end, and Trunkett was yet unsure as to the cause of the failures. Although Trunkett testified that he never made any promises to have the engines completed by the start of the 2014 boating season, clearly the time for performance had expired by the end of the season. Thus, we find that any right to cure that was available to Big 3 Automotive under R.C. 1302.52(A) had expired prior to appellee taking the engines to Sterling Performance.

{¶ 81} In sum, we find that the determination that Big 3 Automotive breached the contract was not against the manifest weight of the evidence. Accordingly, we find appellants' first and third assignments of error not well-taken.

## 2. Warranty Disclaimer

{¶ 82} In appellants' second assignment of error, they argue that the trial court erred by finding that the language of Big 3 Automotive's invoices did not disclaim the implied warranties of merchantability and fitness for a particular purpose.

{¶ 83} The exclusion or modification of the implied warranties of merchantability and fitness for a particular purpose is governed by R.C. 1302.29, which states, in relevant part:

(B) Subject to division (C) of this section, to exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing must be conspicuous, and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous. Language to exclude all implied warranties

31.

of fitness is sufficient if it states for example, that "There are no warranties which extend beyond the description on the face hereof."

(C) Notwithstanding division (B) of this section:

(1) unless the circumstances indicate otherwise all implied warranties are excluded by expressions like "as is," "with all faults," or other language which in common understanding calls the buyer's attention to the exclusion of warranties and makes plain that there is no implied warranty * * *.

{¶ 84} Here, the agreement between the parties was not reduced to writing. However, Big 3 Automotive's invoice states at the bottom: "Big 3 Automotive LLC implies no warranty on labor or parts unless otherwise stated." Relying upon this language, appellants argue that no warranties, express or implied, apply to this case.

{¶ 85} In response, appellee contends that Trunkett failed to disclaim the implied warranties of merchantability or fitness for a particular purpose at the time of the formation of the agreement. Appellee notes that the language contained in the invoice was not presented to appellee until well after the parties entered into the oral agreement that gave rise to appellants' work on the engines. Thus, appellee urges that the invoice language has no effect on the implied warranties. Additionally, appellee argues that the invoice language is silent as to the implied warranty of merchantability and, thus, cannot be construed as a disclaimer of that warranty.

{¶ 86} At the outset, we note that the trial court's decision sets out the standard for disclaiming implied warranties, but does not reference those warranties in its analysis or

32.

specifically find that appellants failed to properly disclaim the warranties. Thus, the trial court's determination that appellants breached the contract in this case does not rise and fall on whether or not the implied warranties were disclaimed. To the extent that the trial court implicitly found the implied warranties of merchantability and fitness for a particular purpose applicable in this case, its damage award was not impacted by the warranty determination because none of the damages that were awarded were attributable to the warranty claims.

{¶ 87} Accordingly, appellants' second assignment of error is not well-taken.

### 3. Misrepresentation

{¶ 88} In their fourth assignment of error, appellants argue that the trial court's finding in favor of appellee on his claim for misrepresentation was against the manifest weight of the evidence. In support, appellants cite the Ninth District's decision in *Textron Fin. Corp. v. Nationwide Mut. Ins. Co.*, 115 Ohio App.3d 137, 684 N.E.2d 1261 (9th Dist.1996), in which the court stated:

> In Ohio, a breach of contract does not create a tort claim. *Wolfe v. Continental Cas. Co.*, 647 F.2d 705, 710 (6th Cir.1981). Generally, "the existence of a contract action * * * excludes the opportunity to present the same case as a tort claim." *Id.* A tort claim based upon the same actions at those upon which a claim of contract breach is based will exist independently of the contract action only if the breaching party also breaches a duty owed separately from that created by the contract, that is, a duty owed even if no contract existed. *Battista v. Lebanon Trotting Assn.*,

33.

538 F.2d 111, 117 (6th Cir.1976). *Id.* at 151; *see also Horen v. Summit Homes*, 6th Dist. Wood No. WD-04-001, 2004-Ohio-6656, ¶ 14 (affirming trial court's dismissal of negligence claim in a breach of contract action where the defendant owed no duty to the plaintiffs beyond those established under the contract).

{¶ 89} Relying upon this language, appellants contend that the only duty they owed to appellee was whatever duty arose out of the contract between the parties. Since there was no duty independent of the contractual duty, appellants assert that the trial court's decision in favor of appellee on the misrepresentation claim was against the manifest weight of the evidence. Moreover, appellants claim that there was no evidence of a misrepresentation of material fact that would support appellee's claim for misrepresentation.

{¶ 90} In response, appellee asserts that he relied on Trunkett's representations concerning an increase in horsepower and would not have spent the money he spent had he known the promised increase was not going to materialize.

{¶ 91} Having thoroughly reviewed the evidence in this case, we agree with appellants that the only duty Big 3 Automotive owed to appellee was the duty that arose out of its promise to increase the performance of appellee's engines, which was the promise that formed the basis for the oral contract between the parties. Because there was no separate duty, Big 3 Automotive's breach merely gave rise to appellee's claim for breach of contract – the breach does not simultaneously support a claim for misrepresentation. *Chemtrol Adhesives v. American Mfrs. Mut. Ins. Co.*, 42 Ohio St.3d 34.

40, 45, 537 N.E.2d 624 (1989), quoting *Battista v. Lebanon Trotting Assn.*, 538 F.2d 111, 117 (6th Cir.1976) ("'[W]hen the promisee's injury consists merely of the loss of his bargain, no tort claim arises because the duty of the promisor to fulfill the term of the bargain arises only from the contract.'"). Thus, the trial court's decision in favor of appellee on his misrepresentation claim is against the manifest weight of the evidence.

{¶ 92} Accordingly, appellants' fourth assignment of error is well-taken. However, the trial court's decision is silent as to any award of damages under this claim, and therefore the error is harmless.

### 4. Damages

{¶ 93} In their fifth assignment of error, appellants argue that the trial court's damage award was against the manifest weight of the evidence. In particular, appellants assert that the trial court improperly awarded appellee $26,200 for payments he made to Big 3 Automotive without deducting $20,249.53, which represented the cost of the parts that appellee retained after taking the engines to Sterling Performance. Further, appellants challenge the trial court's award of $41,956.53 for the services performed by Sterling Performance, because they claim that appellee failed to introduce evidence to establish that the services were necessary to cure the defect in the engines.

{¶ 94} In response, appellee urges that the trial court properly awarded him damages pursuant to R.C. 1302.86, which provides a buyer with the right to cover under certain circumstances. Because appellants' arguments do not relate to whether appellee

35.

was entitled to cover or whether the trial court properly applied R.C. 1302.86, we need not address the application of R.C. 1302.86 in order to resolve the issues raised by appellants.

### a. Payments Made to Big 3 Automotive

{¶ 95} In its decision and judgment entry, the trial court awarded appellee $26,200 for payments he made to Big 3 Automotive. The trial court went on to deduct $5,200 from that amount, which represented the cost of the engine block that was cracked prior to Big 3 Automotive's attempt to repair the engines. According to appellants, the trial court should have deducted the entire cost of parts that were installed by Big 3 Automotive from appellee's damage award.

{¶ 96} At trial, D'Anniballe testified concerning the issue of the parts that were installed by Big 3 Automotive, stating that he utilized whatever existing components that remained suitable during the rebuild process, and supplemented those components with new parts. Additionally, appellee testified that the parts that were installed and later removed from the engines were offered to, and refused by, Trunkett. Appellee went on to testify that the parts are currently stored in his garage, and are of no value to him.

{¶ 97} In light of the testimony offered by D'Anniballe and appellee, we do not find the trial court's failure to deduct the value of the parts installed by Big 3 Automotive to be against the manifest weight of the evidence. The record demonstrates that appellee offered to return the parts, which are of no value to him. Because Big 3 Automotive refused to accept the parts, we find no merit to appellants' contention that appellee's damages should have been offset by the value of the rejected parts. Moreover, we note

36.

that the trial court did properly deduct the value of the engine block that was installed by Big 3 Automotive, as that part was retained by Sterling Performance.

### b. Payments Made to Sterling Performance

{¶ 98} Next, we turn to appellants' argument that appellee failed to introduce evidence to establish that the services performed by Sterling Performance were necessary to cure the defect in the engines. The trial court awarded appellee $41,956.53 for these services. At trial, D'Anniballe explained that the invoice for that amount reflected the services provided by Sterling Performance to rebuild the engines after it was determined that the engines were unsuitable for marine use following Big 3 Automotive's modifications. On the issue of necessity, D'Anniballe testified that the work performed by Sterling Performance was "necessary to change the engine and reconfigure it into a fashion that it would survive for [appellee's] intended usage." D'Anniballe later explained that both of the engines suffered from the same flawed design that would have ultimately led to their failure. D'Anniballe testified that both of appellee's engines were improperly configured, making them unable to endure the type of extended, high-load marine application for which they were being used.

{¶ 99} In view of the testimony provided by D'Anniballe, we find that appellee established that his payment to Sterling Performance in the amount of $41,956.53 was necessary in order to have the engines rebuilt in a manner that would make them suitable for marine use. Thus, we find that the trial court's award of $41,956.53 was not against the manifest weight of the evidence.

37.

{¶ 100} Lastly, appellants challenge the trial court's award of damages to appellee for the amount appellee paid to Art Cook Marine Services. Having already vacated the trial court's award of damages as it relates to the invoice from Art Cook Marine Services under appellants' sixth assignment of error, we need not address that issue here.

{¶ 101} Accordingly, we find appellants' fifth assignment of error not well-taken.

### 5. Rejection of Appellants' Counterclaims

{¶ 102} In their ninth assignment of error, appellants argue that the trial court's findings in favor of appellee on their counterclaims for breach of contract, conversion and unjust enrichment, and fraudulent misrepresentation were against the manifest weight of the evidence.

{¶ 103} Regarding their counterclaim for breach of contract, appellants reassert the same arguments they raised in their first and third assignments of error relating to their right to cure the defects in the engines and appellee's alleged infringement upon that right. For the reasons stated in our analysis of the first and third assignments of error, we find no merit to appellants' arguments, and thus conclude that the trial court properly rejected appellants' breach of contract counterclaim.

{¶ 104} Concerning the conversion and unjust enrichment counterclaim, appellants argue that appellee has wrongfully retained all the parts used in connection with the contract with Big 3 Automotive. As discussed above in our analysis of appellants' fifth assignment of error, the record demonstrates that appellee has offered to return these parts, which are of no use to him, but appellants have refused to accept the

38.

parts. On these facts, we find that the trial court's rejection of appellants' conversion counterclaim was not against the manifest weight of the evidence.

{¶ 105} With reference to appellants' fraudulent misrepresentation claim, they assert that appellee misrepresented to Big 3 Automotive that he was not subject to sales tax because he was operating as a nonprofit organization when, in fact, he was not operating as a nonprofit and was therefore obligated to pay sales tax.

{¶ 106} In order to prevail on their fraudulent misrepresentation counterclaim, appellants were required to establish all of the following elements: (1) a representation, or where there is a duty to disclose, concealment of a fact, (2) which is material to the transaction at hand, (3) made falsely, with knowledge of its falsity, or with such other disregard and recklessness as to whether it is true or false that knowledge may be inferred, (4) with the intent of misleading another into relying on it, (5) justifiable reliance upon the representation or concealment, and (6) a resulting injury proximately caused by the reliance. *Cliff v. Loudenslager*, 12th Dist. Clermont No. CA2006-01-002, 2006-Ohio-5844, ¶ 15; *Gaines v. Preterm-Cleveland, Inc.*, 33 Ohio St.3d 54, 55, 514 N.E.2d 709 (1987).

{¶ 107} While appellants contend that they were injured as a result of appellee's statement that he was tax-exempt, it is unclear how they were damaged as a result of appellee failing to pay the sales tax for which he is allegedly responsible. Moreover, appellants introduced no evidence to establish the extent of their damages, if any. Therefore, we find that the trial court's rejection of appellants' fraudulent misrepresentation claim was not against the manifest weight of the evidence.

39.

**{¶ 108}** Having concluded that the trial court's rejection of appellants' counterclaims was not against the manifest weight the evidence, we find appellants' ninth assignment of error not well-taken.

### III.  Conclusion

**{¶ 109}** In light of the foregoing, the judgment of the Ottawa County Court of Common Pleas, is hereby affirmed, in part, and reversed, in part.  The trial court's award of damages to appellee for the payments made to Art Cook Marine Services, Inc. and Orlandi Performance LLC (totaling $12,297.07) are vacated.  The remainder of the trial court's judgment is affirmed.  The parties are to split the costs of this appeal pursuant to App.R. 24.

Judgment affirmed, in part,
and reversed, in part.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Arlene Singer, J.            _____
                                          JUDGE
Christine E. Mayle, P.J.

Gene A. Zmuda, J.           _____
CONCUR.                             JUDGE

                                           _____
                                           JUDGE